# Southern Pennsylvania Iron and Railroad Co. *versus* Stevens's Exr's.

1. The court submitted to the jury first : what was the purpose of a char-ter of a corporation, and second : whether that purpose had been changed by a supplement to the original act, with a view to perpetrate a fraud on a sub-scriber to the stock. *Held,* that this was not error.

2. By the supplement to an act incorporating an iron and railroad com-pany the name of the company was changed, authority was given to pur-chase and cancel the original stock and the main purpose of the new com-pany was to be that of a general transportation company. *Held,* that it was a fair question for the jury, whether a combination to change the funda-mental purpose of the original act by the supplement and divert the stock of an original subscriber to this new end, was not a fraud upon him, and if they so found an action for the amount of this original subscription could not be sustained.

May 21st 1878. Before AGNEW, C. J., MERCUR, GORDON, PAX-SON, WOODWARD and TRUNKEY, JJ. SHARSWOOD, J., absent.

Error to the Court of Common Pleas of *Lebanon county :* Of May Term 1877, No. 175.

Assumpsit by the Southern Pennsylvania Iron and Railroad Company against Oliver J. Dickey and others, executors of Thad-deus Stevens, deceased, to recover the sum of $28,500 with interest, the balance due on a subscription of Mr. Stevens to the capital stock of the Caledonian Iron, Land and Railroad Company, the name of which was subsequently changed to that of the company plaintiff.

The suit was originally brought in the Common Pleas of Lancas-ter county, but the venue was afterwards changed to Lebanon county.

At the trial it appeared that Thaddeus Stevens was the owner of a large tract of land in Franklin county, Pennsylvania, which was known as the Caledonian Iron Works. Stevens united with Dan-iel V. Ahl and others, and procured the passage of the Act of March 22d 1867, Pamph. L. 542, to incorporate the Caledonian Iron, Land and Railroad Company whereby the company was authorized to purchase and hold lands, manufacture iron, lumber and fire-brick, and to mine coal, ore, fire-clay and other minerals, and to construct and operate a railroad to connect its lands and works with other railroads. Among the subscriptions to the stock was one of Mr. Stevens for 300 shares. On the 3d of June 1867 the governor issued his letters patent, but no organization of the company took

place prior to Mr. Stevens's death.  After his death in 1868, Ahl arranged with one Jones to construct a railroad to an estate owned by Ahl called Mount Pleasant, for which purpose Jones was to furnish the means.  They obtained control of the charter of the Caledonia Company and then obtained the passage of two acts as supplements thereto, viz: the acts of February 20th 1869, Pamph. L. 230, and April 30th 1869, Pamph. L. 879 and 1439, whereby the name of the company was changed to the Southern Iron and Railroad Co.  Among the powers thereby conferred was authority to purchase and cancel the original stock of the company, and it was also given the powers of a general transportation company. The railroad was then built to the Mount Pleasant estate, but it was of no use whatever to the Caledonian Iron Works, as it is thirty miles distant therefrom.

In their general charge, the court, Pearson, P. J., inter alia, said :

" You have heard this case fully and elaborately argued on numerous questions of law, and the court is urged to decide it as such, yet in our opinion there are a few important questions of fact to be determined by the jury, which will be submitted for your consideration.  1st.  What was the original object, scheme and design of the law under which this company was incorporated, and to which Mr. Stevens subscribed his money ?  And 2d.  Has that object been entirely perverted and changed by the supplemental law under which this corporation was formed and carried on, and was the change effected with the view or attempted to be used for the purpose of perpetrating a fraud on the estate of Mr. Stevens ?

" What was the object and design of the Act of the 22d of March 1867, under which this company was incorporated ?  It is entitled an act to incorporate the 'Caledonian Iron, Land and Railroad Company.'  Originally the title of an Act of Assemby was looked upon as an unimportant part, though occasionally called into aid in its construction.  It is now of the very essence of the statute, the amendment to the constitution in 1874, requiring the subject of the bill to be clearly expressed in the title.  It is made an essential part of the act.  The location is again expressed in the body of the first section, and the business to be carried on is mainly described in the 5th sect. ; among other things to make lumber, manufacture iron, &c., and to mine ore, coal and fire-clay, limestone, &c.  The 6th sect. gives power to construct railroads in connection with the works, as we would understand it, to enable it to reach to and connect with other railroads.  The proceeding on this subject is to be under the Act of 1849.  Before any organization of the company had taken place by the election of officers, or other acts done, after the enactment of several supplements, not important to be considered, one was passed on the 30th April 1869, changing the style and title of the 'Caledonian Iron, Land and Railroad Company' to the 'Southern Pennsylvania Iron and Railroad Company,' to exist

[Southern Penna., &c., Railroad Co. *v.* Stevens's Ex'rs.]

under that name as effectually as if it had been given under its original character of incorporation, and such change was not to affect the rights of the corporation or individuals, but all subscriptions to the capital stock of the Caledonian Iron, Land and Railroad Company may be recovered as other debts are by law recoverable in the new name thus given to the corporation. It also gives to this new company all the rights, powers and privileges of a general transportation company, with power to construct and operate a telegraph along the line of the railroad. It is conceded that when this corporation was formed, and Mr. Stevens subscribed to its stocks he was the owner of the Caledonian Iron Works, with about 20,000 acres of land in their immediate vicinity. It may also be fairly inferred that the main object of the corporation was manufacturing iron and lumber, and the mining and sale of minerals; the railroad was to be mainly used for the transportation of these articles from Caledonia. Stevens was the principal subscriber to the stock, and probably paid all that ever was paid to procure the charter and the taxes due to the state thereon, some $1500, and so far as we can collect from the evidence not a dollar was ever paid by any other person, either under the original charter, or any of its supplements, for stock in this company, down to the present day. From the form of the original charter, the contemplated location of its works, the character and nature thereof, and those principally and almost solely engaged in getting it up, the jury must judge where it was expected its mining and manufacturing would be done and its railroad made. It is now conceded that under the supplement of April 30th 1869, the whole business of manufacturing and making railroads has been transferred to the opposite side of the mountain from Caledonia, a distance of over fifteen miles, and the railroad runs in the opposite direction from the property of Mr. Stevens, and from the course taken is of no use whatever to him or his property, and is attempted, so far as made, to be converted into a general transportation company.

"Had no new statute been enacted, it is more than probable the estate of Mr. Stevens would have been bound by his subscription, but nothing was done, no meeting after the 12th of June 1867. Stevens died on the 12th of August 1868, and no one looked after the corporation until February 1869, although no company was formed until after the death of Mr. Stevens, yet he would not have been relieved, as his representatives could have obliged the corporation to adhere to the original object of the charter (make a railroad from Caledonian Iron Works), but under the new statute the whole location was changed. The main fact submitted to the jury is this, from all of the evidence was the new law, with its supplements, got up for the purpose of forming a new company. That is partly a question of law for the court and partly of fact for the jury. The variance between the law and its supplements is not so decisive as

to enable the court to declare as matter of law that it is fatal, but the jury must judge from all the facts proved whether this was to be got up as a new company or a continuation of the old one? * * *

"Was it to be a new company? If it was, Stevens was not a member of it. He could say, I did not enter this new organization. If the original object was entirely changed, even by legislation, his estate could not be held, more especially if all of this was done without any notice to his representatives. Thus far no company had been organized, therefore the first subscribers could scarcely be bound as corporators though they might be by their subscriptions if the object of the corporation was not changed. Was the object in obtaining the new law and organizing under it fraudulent, done for a fraudulent purpose? We are not prepared to say that merely changing the name by the supplement would be such an alteration as would release original subscribers. Yet the jury can judge how far this tends to show a perversion from the original purpose. Giving permission to erect a telegraph line along the original road would not be such change. Altering that originally intended as a railroad to carry the products of the defendants' mines and manufactures into a general transportation company might to a great extent pervert the object of the road, as those companies frequently extend their business throughout the United States, by connecting various companies by different lines, but the main matter for this jury to decide is whether the supplemental laws were intended as a fraud on the original subscribers by changing the whole object of the charter to which they lent their names by transferring the road to another and different place, going to other land for manufacturing and mining from that intended by the subscribers, and by the original law, and was this done by fraud and conspiracy to promote the interest of others, and subvert that of Stevens, who we may suppose from his expenditures and subscriptions intended and expected to promote his own interest. Was it intended as a fraud on him or his estate? for so far as we can see all of the other stockholders are released. Debts are said to now exist, and it is claimed that this stock should be collected for the use of creditors. Not one of these debts were contracted during the lifetime of Mr. Stevens, or under the original law to which he gave his subscription. They are all contracted under the supplemental law and by those who got it up. He was never a member of this organization provided the jury are satisfied from all the facts that this is in reality and effect a new charter for a new road, in a different place from the road to which he subscribed. The legislature can enable subscriptions to be recovered where there exists mere informalities in the method of subscribing, but it transcends legislative power to make new contracts for men to which they never gave their assent.

"Many points of law have been raised, but those stated are the
6 NORRIS—13

only facts to be submitted to the jury; all of the others are unmixed questions of law. If the jury is of opinion after carefully considering all of the facts that the charter to which Mr. Stevens lent his subscription has been so far perverted and changed by the supplemental laws as not to bind him to the contract, on the principles we have stated, they will find a verdict in favor of the defendants. If they believe that there was not such a perversion of the original law, and that under all of the evidence he ought to be held, their verdict will be in favor of the plaintiff."

The verdict was for the defendants, and the plaintiffs took this writ, assigning for error, among others, the submission to the jury of the two questions as above stated.

*Charles Henry Jones, A. R. Boughter, Wayne McVeagh* and *Thomas E. Franklin,* for plaintiff in error.—The subscription was an unconditional one to the purposes described in the charter, and a change such as here made did not release from liability therefor : Turnpike Co. v. Phillips, 2 Barr 184 ; Irwin v. Turnpike Co., Id. 466 ; Clark v. Monongahela Navigation Co., 10 Watts 364 ; Gray v. Monongahela Navigation Co., 2 W. & S. 156 ; Everhart v. Phila. & West Chester Railroad Co., 4 Casey 339 ; Plank-road Co. v. Arndt, 7 Id. 317. Misconduct, however illegal or fraudulent, on the part of other stockholders or of officers of the company, or even the attempted exercise of illegal authority over the corporation by the legislature itself, will not avail as a defence to an action for subscription before organization : Bedford Railroad Co. v. Bowser, 12 Wright 29 ; Nippenose Manufacturing Co. v. Standon, 18 P. F. Smith 256 ; Anderson v. N. & R. Railway Co., 12 Ind. 376. The motives of those who were instrumental in procuring the supplements were irrelevant to the question of liability upon the subscription : Cochran v. Arnold, 8 P. F. Smith 399 ; Garrett v. Dillsburg, &c., Railroad Co., 28 Id. 465.

*Josiah Funk, George M. Kline* and *Jeremiah S. Black,* for defendants in error.—The purpose of the original charter was limited, and this was vitally and fundamentally changed by the supplements, and Mr. Stevens was thereby relieved from liability on his subscription: Lauman v. The Lebanon Valley Railroad Co., 6 Casey 42 ; Angell and Ames on Corp., pl. 531 ; McCully v. Pitts. and Connellsville Railroad Co., 8 Casey 25 ; County of Crawford v. Pittsburgh & Erie Railroad Co. et al., Id. 141 ; Mercer County v. Pittsburgh & Erie Railroad Co., 3 Id. 403 ; Everhart v. Phila. & West Chester Railroad Co., 4 Id. 352 ; Indiana and Evansburg Turnpike Co. v. Philips, 2 Barr 184 ; Plank-road Company v. Arndt, 7 Casey 317 ; Middlesex Turnpike v. Locke, 8 Mass. 268 ; Same v. Swan, 10 Id. 389. The submission to the jury of the questions of the object and design of the supplements was

proper. There was an ambiguity arising from extrinsic evidence, as to what was the intention of the original incorporators, and the jury was the proper tribunal to decide the question: Beatty *v.* Lycoming County Ins. Co., 2 P. F. Smith 456; Eby's Appeal, 20 Id. 314.

The judgment of the court was entered May 27th 1878,

Per Curiam.—The charter of the Caledonian Iron, Land and Railroad Company, passed on the 22d of March 1867, to enable the stockholders to purchase and hold lands to a large extent, and manufacture iron, lumber and fire-bricks, and to mine coal, ore, fire-clay and other minerals, was intended for a private purpose. It had nothing public in its character, the railroad being ancillary to the business, and local, and not intended for general transportation. The 2d section of the supplement of April 10th 1867 distinctly recognises the true character of the principal purpose, in authorizing the company, after organization, to proceed to purchase any lands for the business specified in the act of incorporation, increasing the quantity to 20,000 acres, and to take possession and proceed to carry out the purposes of the corporation. The title of the Act of 22d March 1867 corresponds to this purpose. It was to the stock of this land, manufacturing and mining company, Mr. Stevens subscribed, evidently intending to use his own large landed estates, called the "Caledonian Iron Works," which gave its name to the corporation, and was then operated by Mr. Ahl and himself in partnership, after Stevens, Ahl being one of the largest subscribers. No organization took place under this charter, and Mr. Stevens died. After his death Ahl and Jones clasped hands and projected the scheme of a railroad for general transportation, in order to interest the public and specially to benefit themselves, the former to sell his Mount Pleasant lands, and the latter to obtain a construction contract, payable in bonds, at enormous prices, from which he hoped, by inflation, to realize a fortune. Hence the Acts of 20th February 1869 and April 30th 1869. These together formed the basis of the new scheme. The contracts and transactions of Ahl, and Jones, who was the *factotum* of the new company, plainly exhibit their designs, while the 5th section of the Act of 20th May 1869, drawn by a skilful hand, shows that the writer thought it would be necessary to purchase the original stock in order to enable them to execute the new powers acquired for the main purpose of a railroad for general transportation. The authority was, not simply to cancel the original stock, but to purchase and then sell *or* cancel it. Had this intent been fulfilled as to Mr. Stevens's stock, and Ahl had procured this with the other shares, to carry out his agreement with Jones, there would have been no fraud on Mr. Stevens's rights. The large sum to be refunded to the estate was too powerful an attraction, and therefore this suit.

Now with all these facts before the jury, it was a fair question whether the combination between Ahl and Jones to change the fundamental purpose of the original act by the new act procured by them, and divert the stock of Mr. Stevens to this new end, was not a fraud upon his estate. There was sufficient evidence to be submitted to a jury, and the verdict is therefore conclusive. This puts an end to the action without reference to other grounds, and the other questions in the case are therefore immaterial. The other errors alleged are unsubstantial, and even if sustained ought not to reverse the judgment.

                                                    Judgment affirmed.